**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tobias Gotbaum, Nathaniel Gotbaum, Ella Gotbaum, the natural children of Carol Anne Gotbaum by and through their Next Friend, Noah Gotbaum; and the Estate of Carol Anne Gotbaum,<br><br>Plaintiffs,<br><br>vs.<br><br>City of Phoenix, a public entity; City of Phoenix Police Department; Chief Jack Harris; Jason K. Toth; Andrew B. Wonya; Duane A. Rigg, Jr.; Dick C. Richards; and Terri L. Klepper,<br><br>Defendants. | No. CV-08-0937-PHX-DGC<br><br>**ORDER** |

Plaintiffs have filed a motion to transfer this case to Tucson. Dkt. #13. Defendants have filed motions to dismiss all pre-death suffering claims and to dismiss the City of Phoenix Police Department as a defendant. Dkt. ##11, 12. The motions have been fully briefed. For reasons stated below, the Court will deny Plaintiffs' motion to transfer, grant Defendants' motions to dismiss the Phoenix Police Department, and deny Defendants' motion to dismiss Plaintiffs' claim for pre-death pain and suffering.[1]

---

[1] Plaintiffs' request for oral argument is denied because the parties have thoroughly briefed the issues and oral argument will not aid the Court's decision. *See Mahon v. Credit Bureau of Placer County, Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999).

## I. Background.

Plaintiffs' complaint arises from the unfortunate death of Carol Anne Gotbaum while in the custody of the Phoenix Police Department at Sky Harbor Airport in Phoenix, Arizona. The facts, in brief, are as follows: On September 28, 2007, Mrs. Gotbaum arrived at Sky Harbor Airport on a flight from New York City. Dkt. #7 at 6. She planned to catch a connecting flight to Tucson, where she intended to enter an alcohol rehabilitation program. *Id.* Mrs. Gotbaum missed her connecting flight, but was told she could catch the next flight to Tucson, leaving in approximately two hours. *Id.* at 8. Mrs. Gotbaum drank excessively while waiting for the next flight. *Id.* When she returned to the gate to board the flight, she was denied a seat on the plane. *Id.* Mrs. Gotbaum became highly agitated, collapsed to the floor, threw her Blackberry, and then ran through the terminal yelling that she was not a terrorist. *Id.* A female TSA employee tried to calm her. *Id.* at 9. When three Phoenix Police officers arrived, they forced Mrs. Gotbaum to the floor, handcuffed her, and escorted her to the airport security office. *Id.* at 9-10.

Mrs. Gotbaum was searched and placed in a holding cell alone. *Id.* at 10. The officers used leg restraints to chain her to a fixed bolt in the cell, and seated her on a bench with her hands still cuffed behind her. *Id.* Sometime later, Mrs. Gotbaum was found in the cell unconscious, sitting on the floor, with her hands under her chin and the leg iron chain across her neck. *Id.* Cardiopulmonary resuscitation efforts were not successful. *Id.*

The events surrounding Mrs. Gotbaum's death received extensive local and national press coverage. Plaintiffs, who consist of Mrs. Gotbaum's three minor children and her estate, assert claims against the City of Phoenix, the Phoenix Police Department, and the police officers who were involved in these events. Plaintiffs' claims include negligence, gross negligence, and violation of Mrs. Gotbaum's constitutional rights under 42 U.S.C. § 1983. *Id.* at 14-23.

## II. Motion to Transfer Venue.

Plaintiffs contend that the publicity surrounding Mrs. Gotbaum's death and the reaction of certain members of the Phoenix community make it impossible for them to

receive a fair trial. They ask the Court to transfer this case to its Tucson Division. Congress has stated that for "the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Plaintiffs bear the burden of showing that a transfer is warranted. *See Warfield v. Gardner*, 346 F. Supp. 2d 1033, 1043 (D. Ariz. 2004).

### A. Legal Standard.

"[I]f pretrial publicity makes it impossible to seat an impartial jury, then the trial judge must grant the . . . motion for a change of venue." *Casey v. Moore*, 386 F.3d 896, 906 (9th Cir. 2004). Courts considering a change of venue based on pretrial publicity have recognized two kinds of jury prejudice: presumed prejudice, where the record demonstrates that the community has been saturated with prejudicial and inflammatory media publicity, and actual prejudice, where jurors actually called for the trial demonstrate that they possess partiality and hostility that cannot be laid aside. *See Harris v. Pulley*, 885 F.2d 1354, 1361, 1363 (9th Cir. 1988). Plaintiffs do not attempt to show actual juror prejudice, nor could they before the jury panel has been called in this case. Plaintiffs instead ask the Court to presume juror prejudice, arguing that their evidence shows a pervasive hostility in Phoenix that will deny them a fair trial.

Before turning to Plaintiffs' arguments, the Court notes two general principles. First, "[t]he presumed prejudice principle is rarely applicable and is reserved for 'an extreme situation.'" *Id.* at 1361 (citation omitted); *see L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1400 (9th Cir. 1984) (court should presume prejudice only where the community has been "'utterly corrupted by press coverage'") (citation omitted). Second, courts are reluctant to presume prejudice too early in a case. As a general rule, "the effect of pretrial publicity can 'be better determined after the voir dire examination of the jurors.'" *Narten v. Eyman*, 460 F.2d 184, 187 (9th Cir. 1969) (citation omitted).

### B. Prejudice in this Case.

Plaintiffs do not claim that the Phoenix community has been saturated with inflammatory pretrial publicity. They do not catalogue newspaper, radio, or television

1  reports to demonstrate the kind of pervasive and unfair publicity that typically is relied on
2  for motions to transfer. Plaintiffs instead provide the Court with lengthy copies of blog
3  entries from several websites – AZCentral.com, TucsonCitizen.com, and AZStarNet.com.
4  Dkt. ##13-2, 13-3, 13-4. Many of these blog comments disparage the Gotbaum family and
5  this lawsuit. Plaintiffs also cite an Arizona Republic newspaper article dated November 15,
6  2007, in which a Phoenix Police Department spokesperson is quoted as saying that comments
7  he heard about Mrs. Gotbaum were uglier than those he heard about two men charged with
8  serial murders. Dkt. #13-2 at 86. Plaintiffs cite an article in Phoenix Magazine reporting that
9  the Arizona Republic suspended blog comments related to Mrs. Gotbaum because reader
10 reactions were so vicious. And Plaintiffs note that the County Sheriff called this case
11 "garbage" in a news conference, and that the County Attorney publicly announced that his
12 office found no criminal wrongdoing on the part of the police officers involved in Mrs.
13 Gotbaum's detention. Dkt. ##13 at 7, 22 at 2-3.

14 　　　　The Court has reviewed the materials submitted by Plaintiffs. To be sure, some of the
15 blog statements are disturbingly malicious. The question before the Court, however, is not
16 whether the blog authors could serve as fair and impartial jurors, but whether an impartial
17 jury can be selected from among the 1.6 million citizens, from five counties, who make up
18 the Court's jury pool.

19 　　　　Jury pool members are presumed to be impartial. *See Irvin v. Dowd*, 366 U.S. 717,
20 723 (1961). To overcome this presumption, Plaintiffs must show saturating and
21 inflammatory press coverage that would reach virtually all members of the jury pool and lead
22 a court to conclude that the pool as a whole has been adversely influenced. Plaintiffs'
23 selected blog entries do not make this showing. Although they clearly show that some
24 individuals in unknown locations are not fair minded about this case, Plaintiffs provide no
25 reason to conclude that the comments of these bloggers represent the views of the jury pool
26 at large. Nor do Plaintiffs provide reason to believe that the blog comments have been
27 widely read.

28

The few articles identified by Plaintiffs and the statements of the Sheriff and County Attorney do not rise to the level of saturating and inflammatory media coverage. They do not constitute a "barrage of inflammatory publicity immediately prior to trial amounting to a huge . . . wave of public passion." *Harris*, 885 F.2d at 1362 (quotation marks and citation omitted). The articles are largely factual, as is the report of the County Attorney's conclusion, and Plaintiffs present no evidence that the Sheriff's comment received widespread publicity.

Plaintiffs claim that voir dire will not enable the Court to exclude biased jurors. They base this contention on comments in a few blogs expressing a desire to serve on the jury in this case. Dkt. #13 at 6-7. But the authors of such comments have no ability to maneuver their way onto the randomly-selected jury panel, nor can the Court presume that this handful of hostile bloggers will somehow be selected from among 1.6 million potential jurors. Moreover, the comments do not suggest that the bloggers would be willing to lie under oath in a federal court in order to be placed on the jury, nor that carefully crafted voir dire questions would fail to reveal their biases.

Plaintiffs are entitled to a fair trial before an impartial jury. The Court is confident that such a jury can be selected from the Phoenix Division jury pool. The Court therefore will deny Plaintiffs' motion to transfer.[2]

**III.     Pre-Death Suffering Under Section 1983.**

Plaintiffs seek to recover damages for the pre-death pain and suffering of Mrs. Gotbaum. Defendants contend that such damages cannot be recovered under section 1983. This motion presents a question of law largely unrelated to the unique facts of this case.

---

[2] Plaintiffs briefly argue that this case should be transferred to Tucson for convenience, but they provide no support for this contention. Dkt. ##13 at 10-11, 22 at 4-5. None of the witnesses, evidence, or parties are located in Tucson, and none of the relevant events occurred there. The Court has considered the relevant factors under section 1404(a) – Plaintiffs' choice of forum, the extent of the parties' contacts with Tucson, the availability of non-party witnesses, and the accessibility of evidence – and concludes that a trial in Phoenix clearly would be more convenient. *See Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000).

Section 1983 was enacted after the Civil War to remedy widespread violations of civil rights in the South. The statute creates a civil cause of action for any person whose federal rights have been deprived by a person acting under color of law. 42 U.S.C. § 1983. The statute does not, however, specify the remedies available to such a person, nor does it address whether the cause of action survives the death of the injured person. *Id.* Congress instead has directed courts to "turn to 'the common law, as modified and changed by the constitution and statutes of the [forum] State,' as long as these are 'not inconsistent with the Constitution and laws of the United States.'" *Robertson v. Wegman*, 436 U.S. 584, 588 (1978) (quoting 42 U.S.C. § 1988). Courts thus look to forum state statutes for the remedies available under section 1983. *Id.* at 589. In doing so, however, courts must confirm that the forum state remedies comport with the Constitution and laws of the United States. "Of particular importance is whether application of state law 'would be inconsistent with the federal policy underlying the cause of action under consideration'" – in this case, section 1983. *Id.* at 590 (quoting *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 465 (1975)).

Defendants contend that the only Arizona statute mentioned in Plaintiff's First Amended Complaint, and thus the only Arizona statute that could possibly apply in this case, is the Arizona wrongful death statute found at A.R.S. § 12-611. *See* Dkt. #7 ¶ 1. This argument misapprehends the nature of the Court's inquiry under section 1988. The question is not what state law has been cited in the complaint, but what state law the Court should look to in order to provide a remedy for an action under section 1983. When applying the remedy selection provision of section 1988, the Court must look to "the most closely analogous state law." *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1188 (7th Cir. 1985).

The most closely analogous Arizona law is the survival statute found at A.R.S. § 14-3110. The First Amended Complaint makes clear that the claim for Mrs. Gotbaum's pre-death suffering is asserted only by her estate. Dkt. #7 ¶ 117, Prayer for Relief ¶ (e). The minor children do not seek to recover such damages, but instead seek to recover damages for their own loss of "the continued companionship and society of their mother." *Id.* ¶ 116. Under Arizona law, a claim under the survival statute may be brought only by a decedent's

estate. *See* A.R.S. § 14-3110; *Gandy v. United States*, 437 F. Supp. 2d 1085, 1087 (D. Ariz. 2006). An estate can also bring a wrongful death claim, but only if no family members of the decedent survive. *See* A.R.S. § 12-612(A). Because several of Mrs. Gotbaum's family members survive, her estate cannot bring a wrongful death claim and has a cause of action only under the survival statute. Thus, the Arizona law that is most closely analogous to the claim asserted by the estate under section 1983 is the Arizona survival statute.[3]

Arizona's survival statute bars recovery of a decedent's pain and suffering. *See* A.R.S. § 14-3110. Plaintiffs argue that applying the statute would be contrary to the compensation and deterrence purpose of section 1983, and that the survival statute therefore should not be applied in this case.

The Supreme Court and Ninth Circuit have not decided this question. *See Robertson*, 436 U.S. at 594-95 ("We intimate no view . . . about whether abatement based on state law could be allowed in a situation in which deprivation of federal rights caused death"); *Smith v. City of Fontana*, 818 F.2d 1411, 1417 n.7 (9th Cir. 1987) (declining to decide the issue), *overruled on other grounds by Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999). A clear majority of federal cases, however, has concluded that when a violation of federal civil rights results in death of the victim, state statutes limiting the remedies of the victim's estate and family members are not consistent with the purposes of section 1983. *See, e.g.*, *Berry v. City of Muskogee*, 900 F.2d 1489, 1499-1507 (10th Cir. 1990); *Bass*, 769 F.2d at 1187-90; *Jaco v. Bloechle*, 739 F.2d 239, 241-45 (6th Cir. 1984); *Gilbaugh v. Balzer*, No. Civ-99-1576-AS, 2001 WL 34041889, at *5-7 (D. Or. June 7, 2001); *Garcia v. Whitehead*, 961 F. Supp. 230, 232-33 (C.D. Cal. 1997); *Guyton v. Phillips*, 532 F. Supp.

---

[3] The First Amended Complaint does not identify the legal basis for the claim asserted by the minor children, but it does mention the wrongful death statute, A.R.S. § 12-611. The Court assumes that the minor children are suing under this statute. The First Amended Complaint also could be read, however, as asserting a claim for the minor children under section 1983. Some courts have suggested that such a claim is not available to family members of the decedent because section 1983 establishes liability "to the party injured." 42 U.S.C. § 1983; *see Andrews v. Neer*, 253 F.3d 1052, 1063-64 (8th Cir. 2001). The Court need not address this issue because it has not been raised in Defendants' motion.

1154, 1164-66 (N.D. Cal. 1981). Defendants cite the thoughtful opinion of Judge Levi in *Venerable v. City of Sacramento*, 185 F. Supp. 2d 1128, 1131-33 (E.D. Cal. 2002), for the opposite proposition, but the Court concludes that the majority view is correct.

The legislative history of section 1983 makes clear that "Congress intended significant recompense when a constitutional violation caused the death of the victim. The general legislative history of the 1871 act makes clear that death was among the civil rights violations that Congress intended to remedy." *Berry*, 900 F.2d at 1501. Indeed, "President Grant's message to Congress in 1871 described conditions in the South that 'rendered life and property insecure' and urged legislation that would 'effectually secure life, liberty, property, and the enforcement of law in all parts of the United States.'" *Id.* at 1502 (quoting Cong. Globe, 42d Cong., 1st Sess. 236 (1871)) (brackets omitted). "[I]n both Houses [of Congress], statements of the supporters of [section 1983] corroborated that Congress . . . intended to give a broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). The statute was designed to accomplish at least two purposes – "compensating those injured" and "preventing official illegality." *Robertson*, 436 U.S. at 592. The Supreme Court has noted that section 1983's "unique remedy make[s] it appropriate to accord the statute 'a sweep as broad as its language.'" *Wilson v. Garcia*, 471 U.S. 261, 272 (1985) (quoting *United States v. Price*, 383 U.S. 787, 801 (1966)), *superseded by statute on other grounds*, 28 U.S.C. § 1658(a).

Most courts have concluded that state statutes limiting civil remedies in cases where a constitutional violation has caused death to the victim simply are not consistent with the purposes of section 1983. Courts have noted that such state laws "are not suitable to carry out the full effects intended for § 1983 cases ending in death of the victim; they are deficient in some respects to punish the offenses." *Berry*, 900 F.2d at 1506. Courts have also noted the incongruity of applying a state law that would allow recovery for pain and suffering if the victim survived the assault, but not if the victim died as a result of it. "The inescapable conclusion is that there may be substantial deterrent effect to conduct that results in the injury of an individual but virtually no deterrent to conduct that kills its victim." *Guyton*, 532 F.

Supp. at 1166. Courts have also noted the ever-changing patchwork of state survival and wrongful death statutes and the fact that adopting them will result in different section 1983 remedies in different states, and differences even within a single state depending on the nature of the cases: "we must consider that different states will define them differently, thus requiring individual analyses of each state's law. We might [also] have to find that a state's law works satisfactorily in some instances, as when there are surviving dependents, but not in other cases, as when there is no one with a right to sue." *Berry*, 900 F.2d at 1506.

As noted above, the Supreme Court has not addressed this question. The Supreme Court did apply a state survival statute to a section 1983 claim in *Robertson*, even though the state statute eliminated the claim after the victim died for reasons unrelated to the violation of his federal rights. 436 U.S. at 590-94. But the Supreme Court specifically noted that its decision was narrow and did not necessarily apply to cases where the civil rights violation caused the death of the victim: "We intimate no view, moreover, about whether abatement based on state law could be allowed in a situation in which deprivation of federal rights caused death." *Id*. at 594; *see id*. at 592 (concluding that application of state law would not be contrary to section 1983's goal of deterring official misconduct "at least in situations in which *there is no claim that the illegality caused the plaintiff's death*") (emphasis added). The Arizona Court of Appeals drew this same distinction when it applied the remedies of Arizona's survival statute in a section 1983 case. *See Badia v. City of Casa Grande*, 988 P.2d 134, 140-41 (Ariz. Ct. App. 1999) ("Inasmuch as Perez's death in this case *did not result* from defendants' alleged use of excessive force, § 14-3110 neither frustrates nor is inconsistent with the policies and purposes of § 1983.") (emphasis added).

Given the broad intent of section 1983, and particularly the fact that Congress sought to provide an effective remedy for unconstitutional killings, the Court concludes that application of the Arizona survival statute and its elimination of pain and suffering damages in cases where death is alleged would be contrary to the purposes of section 1983. The Court therefore will apply a federal remedy that permits the recovery of such damages. *See*, *e.g.*, *Berry*, 900 F.2d at 1507; *Bass*, 769 F.2d at 1190.

1  The Court hastens to note that this a not situation where deference should be afforded
2  to policy decisions of state lawmakers. The cause of action under section 1983 is federal,
3  and the remedy must be selected in accordance with Congress's directive in section 1988.
4  The sole question, therefore, is whether the remedy of the most closely analogous forum state
5  law would effectuate the broad purposes of section 1983. Choosing not to apply state law
6  implies no disrespect for that law, and is not intended to suggest that the Arizona legislative
7  scheme is somehow deficient for state tort cases. It simply suggests that the Arizona statute
8  is not well suited to accomplishing the wide remedial objectives section 1983.

**IV.     Motion to Dismiss the City of Phoenix Police Department.**

Defendants ask the Court to dismiss the City of Phoenix Police Department because it is not a jural entity subject to suit. Dkt. #11. There is no controlling Arizona case on point, and judges of this Court have reached different conclusions on whether the Maricopa County Sheriff's Department is a jural entity. *Compare Agster v. Maricopa County*, No. CV-02-1686-PHX-JAT (March 3, 2005 Order) (declining to dismiss the Maricopa County Sheriff's Office as a non-jural entity),[4] *with Wilson v. Maricopa County*, No. CV-04-2873-PHX-DGC, 2005 WL 3054051 (D. Ariz. 2005) (dismissing the Maricopa County Sheriff's Office as a non-jural entity).

The City of Phoenix is a public entity subject to suit. *See* A.R.S. § 12-820, 1984 Laws Ch. 285, § 1 (recognizing that the purpose of A.R.S. § 12-820 *et seq.* is to abrogate traditional sovereign immunity with respect to public entities). A public entity is defined as "this state and any political subdivision of this state." A.R.S. § 12-820. Cities "are political subdivisions of the state." *City of Tucson v. Fleischman*, 731 P.2d 634, 637 (Ariz. Ct. App. 1984).

Plaintiffs argue that the Police Department is also a political subdivision under the test established in *McClanahan v. Cochise College*, 540 P.2d 744 (Ariz. Ct. App. 1975).

---

[4] The same judge clarified in *Heath v. Maricopa County*, No. CV05-1362-PHX-JAT, 2007 WL 1526430, at *2 (D. Ariz. May 23, 2007), that in *Agster*, the Maricopa County Sheriff's Office and the Sheriff in his official capacity were treated as a single entity for purposes of the verdict.

- 10 -

1  *McClanahan* states that "[t]he attributes which are generally regarded as distinctive of a
2  political subdivision are that it exists for the purpose of discharging some function of local
3  government, that it has a prescribed area, and that it possesses authority for a subordinate
4  self-government by officers selected by it." *Id*. at 747.  The Police Department satisfies each
5  of these criteria, but so do many offices within city government.  Plaintiffs' argument would
6  suggest that many parts of the City's operation constitute separate political subdivisions
7  subject to suit.  The Court cannot agree with so broad a proposition, particularly when
8  *McClanahan* did not concern whether an entity is subject to suit.  Neither the Arizona
9  legislature nor the City has stated that the Police Department is a separate jural entity.[5]

10  Consistent with its previous decision in *Wilson*, the Court concludes that the Phoenix
11  Police Department is a subpart of the City of Phoenix, not a separate entity for purposes of
12  suit. *See Wilson,* 2005 WL 3054051, at *2 (dismissing the Maricopa County Sheriff's Office
13  because it is not a jural entity separate from Maricopa County).  Other cases support this
14  conclusion.  *See Pierre v. Schlemmer*, 932 F. Supp. 278, 280 (M.D. Fla. 1996) ("'Where a
15  police department is an integral part of the city government as the vehicle through which the
16  city government fulfills it policing functions, it is not an entity subject to suit.'") (citation
17  omitted); *Jacobs v. Port Neches Police Dep't*, 915 F. Supp. 842, 844 (E.D. Tex. 1996)
18  (sheriff's department was not a proper party to the suit because the county had not expressly
19  "'grant[ed] the servient agency with jural authority'") (citation omitted); *Sullivan v.*
20  *Chastain*, No. Civ.A.SA04CA0803XR, 2005 WL 354032, at *2 (W.D. Tex. Jan. 4, 2005)
21  (dismissing the City of Bandera Police Department because "an entity without a separate
22  jural existence is not subject to suit"); *see also Del Tufo v. Twp. of Old Bridge*, 650 A.2d
23  1044, 1046 n.1 (N.J. Super. Ct. App. Div. 1995) ("'Old Bridge Township Police Department'
24  is probably not a jural entity and is therefore probably not subject to suit in its own name.").

25

26  [5] Plaintiffs cite Chapter III, § 3 of the Phoenix City Charter to support their argument,
27  but this section merely establishes that the City may create, change, and abolish offices,
    departments, agencies, boards, and commissions.  The section does not mention the Police
28  Department, and nothing in it suggests that the section was designed to identify separate jural
    entities within the City's organizational structure.

- 11 -

Plaintiffs have sued the City of Phoenix and the individual defendants. Dismissal of the Police Department will not deprive them of any remedy to which they are entitled.

**IT IS ORDERED:**

1. Plaintiffs' motion to transfer venue (Dkt. #13) is **denied**.
2. Defendants' motion to dismiss pre-death suffering claims (Dkt. #12) is **denied**.
3. Defendants' motion to dismiss the City of Phoenix Police Department as a non-jural entity (Dkt. #11) is **granted**.
4. The Court will schedule a Rule 16 case management conference by separate order.

DATED this 17th day of October, 2008.

*/s/ Daniel G. Campbell*
David G. Campbell
United States District Judge